STATE OF NORTH CAROLINA v. MICHAEL RAY WILSON

No. 654A84

(Filed 5 May 1988)

**1. Criminal Law § 89.7; Witnesses § 1— psychiatric evaluation of witness—denial of motion**

The trial court properly denied defendant's motion for a psychiatric evaluation of a State's witness.

**2. Constitutional Law § 31— denial of funds for experts**

The trial court did not err in denying defendant's motions for funds with which to hire experts in pathology, fingerprints and psychology where defendant failed to show a particularized need for such expert assistance but merely indicated that assistance in looking for fingerprints and a pathologist and psychologist might be helpful to him in preparing his defense.

**3. Criminal Law § 101.4— executions of others—refusal to sequester jurors**

The trial court did not abuse its discretion in denying defendant's request to sequester the impaneled jurors in his first degree murder trial because his trial occurred at the time of the execution of Velma Barfield in this state and executions in other states, since the effects of executions on capital trials cannot be calculated. N.C.G.S. § 15A-1236(b).

**4. Jury § 7.11; Criminal Law § 135— nature of capital sentencing—refusal to instruct**

The trial court did not err in refusing to give defendant's requested instructions to prospective jurors on the nature of capital sentencing.

**5. Jury § 6.4— capital case—prospective juror—question about parole from life sentence—instruction by court—exclusion of further questions about parole**

When a prospective juror in a capital case asked the court whether it had any responsibility for parole from life sentences, the trial court properly instructed all the jurors that "life means life" and they should not concern themselves with any other definition of the term; moreover, the court's refusal to permit defense counsel to question the prospective juror further about her views of parole was not error where there was no indication that the juror's views about parole in any way influenced her decision in the present case; defense counsel was able to elicit from the juror, in the context of her concern about parole from a life sentence, that she would be able to follow the law on sentencing as stated by the judge, regardless of her own feelings; and defendant did not challenge this juror for cause or peremptorily.

**6. Criminal Law § 34.3— evidence of defendant's prior incarceration—error cured by court's actions**

Any prejudice to defendant from a statement by a witness that he and defendant had "done time together" was cured by the prompt corrective action by the trial court in sustaining defendant's objection, striking the testimony, and instructing the jury not to consider it.

**7. Criminal Law § 77.3 — declaration against penal interest — inclusion of collateral statements**

Remarks taken out of a general statement which as a whole is against the penal interest of the declarant need not themselves, standing alone, be against the declarant's penal interest in order to be admitted; rather, collateral statements are admissible even though they are neutral as to defendant's interests if they are integral to a larger statement which is against the declarant's interest.

**8. Criminal Law § 77.3 — statements by murder victim — declarations against penal interest**

Statements made by a murder victim to a deputy sheriff that he participated in stealing property from a farm, that defendant also participated, and that defendant and others had threatened to kill him if he told anyone were admissible under N.C.G.S. § 8C-1, Rule 804(b)(3) (1986), as statements against penal interest, although only the statement that defendant participated in the crime was a disserving statement, since the two collateral statements concerning defendant's participation and the threats against the victim are essential to an understanding of the victim's motivation in making the disserving statement and therefore became a part of the disserving statement.

**9. Criminal Law § 77.3 — declarations against penal interest — indications of trustworthiness**

Corroborating circumstances indicated the trustworthiness of a murder victim's statements against penal interest that he and defendant participated in larceny at a farm and defendant threatened his life if he told anyone so as to render them admissible where the statements led to the discovery of stolen items, and the victim was found murdered within one day of the arrest of defendant's brother based on the victim's statements.

**10. Criminal Law § 89.8 — accomplice testimony — plea bargain — exclusion of questions concerning effect of life sentence**

Where a witness in a first degree murder case had already testified that he was motivated to testify for the State because of a plea bargain reducing the charge against him to second degree murder with a sentence of life imprisonment, the trial court did not abuse its discretion in refusing to permit defense counsel to ask the witness whether he was "aware that a life sentence would mean that you could get out in less time than a fifty-year sentence" since the witness had previously given testimony more probative of bias than the legal distinction asked of him by defense counsel.

**11. Criminal Law § 35 — evidence of motive by others to commit crime charged**

The trial court in a first degree murder case did not err in restricting defendant's cross-examination of a State's witness concerning a motive by the witness and others to kill the victim because the victim knew about a break-in they had committed where it is clear from *voir dire* testimony that defendant could not establish through this witness that the victim knew about the results of the alleged break-in or was known by the witness and others to be talking to law officers about the crime, and defendant was thus unable to produce

State v. Wilson

evidence that did more than create an inference or conjecture of another's guilt of the crime charged.

**12. Criminal Law § 73.2— affidavit for search warrant—statement not hearsay**

An affidavit for a search warrant that identified a murder victim as the source of information concerning stolen property on a farm owned by defendant's brother was not inadmissible hearsay since it was not offered to prove the truth of the matter asserted therein but was offered to show that defendant had information that the victim was informing on him and his brother.

**13. Criminal Law § 89.6— cross-examination—knowledge of sequestration of other witnesses**

Where defendant's mother remained in the courtroom during the State's presentation of the testimony of an accomplice and thereafter offered testimony directly contradicting the accomplice, it was appropriate for the prosecution to impeach the credibility of defendant's mother by asking her whether she knew that the witnesses in the case were being sequestered; however, assuming *arguendo* that it was error to ask such a question, the error was not prejudicial since the trial judge sustained defendant's objection and did not permit the witness to answer.

**14. Homicide § 21.5— first degree murder by choking—premeditation and deliberation**

There was sufficient evidence of premeditation and deliberation to support defendant's conviction for first degree murder where there was substantial evidence that defendant choked the victim to death; the medical examiner testified that ligature strangulation was a cause of death and that abrasions on the victim's neck could have been caused by a rope; the State's key witness testified that defendant tied up the victim with a rope before killing him; and a portion of the rope was introduced into evidence.

**15. Kidnapping § 1.2— first degree kidnapping—murder—restraint and serious injury—same evidence not used for both crimes**

Defendant was not entitled to have a charge of first degree kidnapping dismissed on the ground that there was insufficient evidence of restraint and serious injury separate from the evidence used for a charge of premeditated and deliberated murder since (1) restraint is not essential to a charge of premeditated and deliberated murder, and (2) the serious injury element which elevated the kidnapping to first degree was not limited to the fatal injury, and any of 39 stab wounds and several ligature abrasions found on the victim's body might have satisfied the injury element of first degree kidnapping.

**16. Criminal Law § 102.8— jury argument—State's evidence uncontradicted—no comment on defendant's failure to testify**

The prosecutor's jury argument that no defense witnesses impeached the State's evidence was not an improper comment on defendant's failure to testify.

**17. Criminal Law § 102.6— jury argument—reason for failure to fingerprint car—supporting evidence**

The prosecutor's jury argument that the State failed to examine defendant's car for evidence of a kidnapping and murder victim's fingerprints

because the car had been in defendant's possession for some time after the crimes and defendant had had many opportunities to remove any fingerprints was supported by competent evidence and was not improper.

**18. Criminal Law § 113.7— instructions on acting in concert—sufficiency of evidence**

The trial court properly instructed the jury on acting in concert as a permissible basis for finding defendant guilty of first degree murder where there was evidence tending to show: an accomplice, not defendant, located the victim on the evening of the murder; when the victim was in defendant's car, the accomplice hit the victim in the face for denying that he had told the police about a theft of farm property; while defendant threatened the victim with his knife in the back seat of the car, the accomplice got rope out of the trunk so that defendant could bind the victim; while forcing the victim into the woods, defendant held the rope that bound the victim and the accomplice held the victim by the trousers; and fibers found on the accomplice's knife were consistent with the fibers in the sleeves of the shirt the victim was wearing when he was murdered.

**19. Constitutional Law § 80— death penalty—Enmund rule inapplicable**

The rule in *Enmund v. Florida*, 458 U.S. 782 (1982), was not violated by the imposition of the death penalty for first degree murder after the court had instructed on acting in concert where all the evidence shows that defendant, himself, struck the fatal blow to the victim.

**20. Criminal Law § 135.9— capital case—mitigating circumstance—no significant history of criminal activity—evidence requiring submission of issue**

The trial court in a first degree murder case erred in refusing to submit the mitigating circumstance that defendant has no *significant* history of prior criminal activity where the State presented evidence that defendant had a prior felony conviction for the second degree kidnapping of his wife, that defendant had stored illegal drugs in his shed, and that he had participated in the theft of farm machinery, since a finding of no evidence of prior criminal activity is not required before this mitigating circumstance must be submitted for the jury's consideration, and the evidence in this case did not amount to such a *significant* history of prior criminal activity that no rational jury could find the existence of this mitigating circumstance. N.C.G.S. § 15A-2000(f)(1) (1983).

**21. Criminal Law § 135.9— capital case—erroneous failure to submit statutory mitigating circumstance—standard for determining prejudice**

Since the failure to submit a statutory mitigating circumstance supported by the evidence in a first degree murder case has federal constitutional underpinnings, the standard for determining prejudice is N.C.G.S. § 15A-1443(b) rather than § 15A-1443(a).

**22. Criminal Law § 135.9— capital case—erroneous failure to submit mitigating circumstance—Pinch test of prejudice no longer used**

The three-prong test set forth in *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203 (1982), for determining whether the trial court's failure in a capital case to

submit a statutory mitigating circumstance supported by the evidence is harmless beyond a reasonable doubt will no longer be used since that test improperly shifts the burden from the State to defendant.

**23. Criminal Law § 135.9— capital case—failure to submit statutory mitigating circumstance—prejudicial error**

The State failed to carry its burden of proving that the trial court's erroneous failure in a capital case to submit the statutory mitigating circumstance as to whether defendant had no significant history of prior criminal activity was harmless beyond a reasonable doubt since it cannot be stated affirmatively that the jury would still have returned a sentence of death if this one mitigating circumstance had been found and balanced against the four aggravating circumstances found by the jury. Therefore, the death penalty is vacated and the case is remanded for a new sentencing hearing.

Justice MARTIN concurring.

Justice MEYER dissenting.

APPEAL by defendant from a sentence of death for a conviction of first degree murder pursuant to a jury recommendation and forty years imprisonment for a conviction of first degree kidnapping, imposed by *Hobgood (Robert H.), J.*, after trial at the 29 October 1984 Criminal Session of Superior Court, GRANVILLE County. Heard in the Supreme Court 9 September 1987.

*Lacy H. Thornburg, Attorney General, by Tiare B. Smiley, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Geoffrey C. Mangum, Assistant Appellate Defender, for defendant.*

FRYE, Justice.

After a thorough review of the record and all the assignments of error made by defendant, we find no error in the guilt phase of the trial. Because we find error in the sentencing phase, we vacate defendant's sentence of death and remand to the trial court for a new sentencing hearing.

Upon pleas of not guilty, defendant was tried by jury on indictments charging murder and first degree kidnapping of Larry Grant Walker.

The State's evidence tended to show that Dr. A. J. Coppridge, a Durham doctor, owned a farm in Person County and that he had discovered that someone had broken into three barns

on his farm some time in January 1984 and had stolen some farm equipment. Deputy Sheriff Dennis Oakley had seen defendant, his brother Larry Wilson and Larry Walker in defendant's pickup truck on a dirt road near the Coppridge farm on or about 19 January 1984.

Deputy Oakley testified at trial that on 10 February 1984, Larry Walker came to the sheriff's office to see him. When they went outside to talk, Larry Walker told the deputy that he knew all about the break-in at the Coppridge farm, indicating that he had been involved in the break-in with defendant, defendant's brother Larry Wilson and Woody Blalock. Walker also told the deputy that defendant, defendant's brother and Blalock had beaten him and threatened to kill him two to three weeks earlier if he told anyone about the break-in. Walker told the deputy that Larry Wilson had one of the tractors from the break-in, but that the others had moved the remainder of the farm equipment so he would not know its whereabouts.

On 11 February 1984, using the information given to him by Walker, Deputy Oakley went out to view Larry Wilson's yard from the road and observed a Ford tractor there. The deputy also took Dr. Coppridge out to Larry Wilson's home to see the tractor in the yard, and the doctor identified the tractor as his own.

On 12 February 1984, Deputy Oakley obtained a search warrant for Larry Wilson's farm, based on the information he had received from Larry Walker and from his own observations. Some of Dr. Coppridge's stolen property was identified by the doctor and seized from Larry Wilson's property. Larry Wilson was arrested later by Oakley for possession of stolen property. The affidavit attached to the application for the search warrant disclosed that the deputy had obtained his information about the Coppridge break-in from a confidential informant and identified the informant as Larry Walker. The deputy testified that when Larry Wilson was in the back seat of the patrol car after his arrest, Wilson read the application and made a comment when he read the part of the affidavit naming Walker.

Oakley testified that on 13 February 1984, he went to see Larry Walker at his place of employment after the arrest of Larry Wilson to advise Walker that he would be charged with the Coppridge break-in. Oakley agreed not to arrest Walker for a few

days because Walker wanted to work. Oakley told Walker that both he and defendant would be charged as soon as he gathered more evidence. That evening Walker was picked up at work by defendant and Woody Blalock.

At the trial of defendant, Woody Blalock became a witness for the State and testified against defendant on the basis of a plea bargain reducing the charge against him to second degree murder with a sentence of life imprisonment. Blalock testified that on the evening of 13 February 1984, defendant told him that he had received word from defendant's brother that Larry Walker was "snitching on him" and that he wanted to see Walker. The two then telephoned Walker at work and rode in defendant's car to the parking lot at Walker's workplace.

Blalock further testified that when they arrived at Walker's place of employment, Walker was standing there waiting for them and got into the back seat of defendant's car. Walker asked what was the problem and said that he only had a few minutes. Defendant handed him a beer and said "let's ride down the road and talk." Walker acted as if he wanted to leave, but defendant shut the door and called Walker a snitch, saying he snitched on his brother Larry Wilson, and "they needed to go get this thing taken care of." Defendant told Walker that Blalock had a gun and Blalock took his Swiss army knife out of his pocket and placed it next to his leg. Defendant then backed out of the parking lot and headed south on Old Durham Road.

Defendant continued driving and asked Walker whether he had gone to the sheriff's department and informed on defendant's brother for having stolen property at his house. Walker denied doing so and turned to Blalock saying, "you know I wouldn't do that." Defendant then drove along several back roads and kept asking Walker about informing to the police and Walker kept denying it. Blalock further testified that at one point Walker told him that the only thing he had told one of the sheriff's deputies was about some tools that he had carried to Durham. Blalock testified that was when he turned around and hit Walker with his fist in the jaw.

After driving a series of back roads, the car approached a stop sign. When it had slowed to about ten or fifteen miles an hour, Walker tried to open the door to jump out. However, de-

fendant grabbed him with his right hand, pulled him back in the car and sped through the stop sign without stopping. Blalock testified that after crossing the intersection and going onto a dirt road, the right rear tire went flat. Defendant stopped, crossed over the seat into the back with Walker, and handed Blalock the car keys.

Defendant then turned Walker onto his stomach, tied Walker's hands behind his back, looped the rope around Walker's neck and body, and pulled the loose end under Walker's groin area. Defendant pulled Walker out of the car and told Blalock to get a flashlight. With defendant holding the loose end of the rope and Blalock holding Walker's belt from behind, they walked about 100 to 150 yards into the woods to a small clearing. Defendant then hit Walker on the head with a tree limb and knocked him onto his back. Blalock further testified that defendant straddled Walker's chest and stabbed him several times. Blalock stated that he started looking around for lights in the area when he heard a gurgling sound. Defendant then stood up, folded his knife and handed it to Blalock saying "the son of a bitch won't talk any more. I cut his throat." Blalock then covered Walker's body with an old car seat and the two walked back to the road.

Defendant did not testify. The defense presented evidence tending to establish that defendant was elsewhere at the time of the homicide.

On 13 November 1984, the jury convicted defendant of the first degree murder of Larry Grant Walker on the basis of malice, premeditation and deliberation, as well as under the felony murder rule. Defendant was also convicted by the jury of first degree kidnapping. At the sentencing phase of the trial, the jury returned its verdict recommending that defendant be sentenced to death, having found four factors in aggravation and having rejected six factors tendered as mitigation.

On 15 November 1984, the trial court sentenced defendant to death for the murder conviction. In sentencing defendant for kidnapping, the trial court found factors in aggravation and sentenced defendant to a consecutive term of forty years. Defendant now appeals his murder conviction and sentence of death to this Court as a matter of right. An order staying execution of the death sentence was entered on 27 November 1984. On 13 March

1986, an order was entered allowing defendant to bypass the Court of Appeals for review of his conviction and sentence for kidnapping.

## GUILT-INNOCENCE PHASE

Defendant raises numerous assignments of error in connection with all phases of his trial. He brings forward as his first assignment of error that the trial court abused its discretion by denying his request for a pretrial psychiatric evaluation of Woody Blalock to determine Blalock's competency to testify. We find no abuse of discretion.

[1] Prior to trial, defendant moved for a psychiatric evaluation of the State's witness Woody Blalock, alleging that Blalock had been hospitalized in psychiatric hospitals a number of times within the past ten years and that defendant had "reason to believe that the State's witness, Charles Woody Blalock, may be incompetent to testify as a witness or possibly may have been incompetent at the time of the transactions giving rise to these indictments." Through this assignment of error, defendant invites this Court to reexamine its previous ruling that trial judges do not have the discretionary power to compel an unwilling witness to submit to a psychiatric examination. *See State v. Clontz*, 305 N.C. 116, 286 S.E. 2d 793 (1982); *State v. Looney*, 294 N.C. 1, 240 S.E. 2d 612 (1978). We decline the invitation and adhere to our previous rulings on this question.

[2] Defendant next assigns as error the denial of his requests for expert assistance, contending that he showed a specific need for such to prepare and present his defense. Prior to trial, defendant moved for funds with which to hire expert assistance in the fields of pathology, hair examination, fingerprints, and psychology. The trial judge allowed only defendant's request for a hair examination expert. We find no error.

In order to be entitled to the appointment of such experts at State expense or to the payment of such experts, defendant is required to make a particularized showing that (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it would materially assist him in the preparation of his case. *State v. Johnson*, 317 N.C. 193, 344 S.E. 2d 775 (1986), construing *Ake v. Oklahoma*, 470 U.S. 68, 84 L.Ed.

2d 53 (1985); N.C.G.S. § 7A-450(b) (1986). In *State v. Penley,* we stated that:

> The Supreme Court explicitly limited the holding in *Ake* to cases in which the defendant made a threshold showing of specific necessity for the assistance of the expert he sought to have appointed by the court. This requirement was subsequently reaffirmed in *Caldwell v. Mississippi,* [citation omitted] and is consistent with decisions of this Court holding that the denial of a motion for appointment of an expert is proper where the defendant has failed to show a particularized need for the requested expert.

*Penley,* 318 N.C. 30, 51, 347 S.E. 2d 783, 795 (1986), citing *State v. Johnson,* 317 N.C. 193, 344 S.E. 2d 775.

The focus in determining whether the trial court erred, then, must be upon what was before the trial court at the time of the motions. An examination of the record shows that at the time the trial court denied these motions, defendant had merely indicated that assistance in looking for fingerprints and the need for a pathologist and psychologist might be helpful to him in preparing his defense. As *Johnson* and its progeny clearly dictate, a more particularized showing than this is required before a defendant is entitled to the appointment of experts or payment of their collateral expenses. Therefore, we find that the trial court did not err here. *See State v. Johnson,* 317 N.C. 193, 344 S.E. 2d 775.

[3] Next, defendant assigns as error the denial of his request to sequester empaneled jurors because of the massive publicity surrounding the execution of Velma Barfield, the first woman executed in the country in twenty-two years. On 1 August 1984, defendant moved for sequestration of the jury for his trial. Defendant's jury selection began on 29 October 1984, the Monday preceding the execution of Velma Barfield. Defendant renewed this motion at the outset of the trial, arguing that there was a strong likelihood that during the course of the trial people would discuss the case with the jurors outside the courtroom. The prosecutor joined in the motion to sequester the jury, adding that the impending execution of Mrs. Barfield, and the large amount of publicity associated with that, would very likely have an improper influence on the jury. During the course of the trial, how-

ever, the jury was not sequestered until after it returned a verdict in the guilt phase. This, defendant assigns as error.

Pursuant to N.C.G.S. § 15A-1236(b), "[t]he judge in his discretion may direct that the jurors be sequestered." However, a motion for individual jury selection and jury segregation or sequestration are matters addressed to the trial court's sound discretion and its exercise of discretion will not be disturbed absent a showing of an abuse of discretion. *State v. Artis*, 316 N.C. 507, 342 S.E. 2d 847 (1986); *State v. Stokes*, 308 N.C. 634, 304 S.E. 2d 184 (1983); *State v. Oliver*, 302 N.C. 28, 274 S.E. 2d 183 (1981).

Here, defendant merely asserts that his trial occurred at a time when other executions were occurring in this State and in other states across the country. Defendant suggests that the publicity and notoriety of other executions, particularly the one of Velma Barfield in this State, prejudiced his chance of receiving a fair and impartial trial. We reject this argument.

The effect of executions on capital trials cannot be calculated. It would be pure speculation to suggest whether such publicity would tend to favor the State or defendant. Consequently, a decision whether to sequester is best left with the trial judge. Only he can determine the climate surrounding a trial and it is he who is in the best position to determine if a shield is necessary to protect jurors, and thus the defendant, from extraneous influences. There being no evidence or showing by defendant to the trial court suggesting the possibility of jury contamination in this case because of the execution of Velma Barfield and others across the country, we find no abuse of discretion on the part of the trial court in denying defendant's motion for sequestration.

[4] Defendant also challenges the trial court's decision denying his request for instructions to prospective jurors on the nature of capital sentencing. Prior to trial, defendant requested in writing that the prospective jurors be instructed about the general issues arising in a capital sentencing proceeding and that their duty in such a proceeding would be "to follow conscientiously the instructions of the Court regarding sentence [sic] and to consider fairly both the penalties provided by law—the death penalty and life imprisonment." The request continued: "The law would require that you give consideration to both penalties notwithstanding your personal views regarding capital punishment, just as it

is a juror's duty to apply the law as the court explains it to you, not as you think it is or think it should be." The trial judge denied the request, instead instructing the jurors simply on the nature of the issues in capital sentencing. We hold that this was not error.

This question was addressed in *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197, *cert. denied*, 469 U.S. 963, 83 L.Ed. 2d 299 (1984). There, this Court held that it was not necessary for jurors to be given a basic understanding of the death penalty process before they may be challenged for cause as a result of their answers to certain questions concerning the death penalty. Specifically, the Court said that "[a]n understanding of the *process* under which the ultimate conclusion is reached should not affect one's *beliefs* as to whether he or she can, under any circumstances, vote to impose the death penalty." *Maynard*, 311 N.C. at 9, 316 S.E. 2d at 202 (emphases in original). Consequently, we find no merit to defendant's argument.

[5] Defendant also asserts that he was denied a fair and impartial trial because the trial court refused to allow the defense attorney to question a prospective witness further on her concerns about parole from a life sentence. Upon examination of prospective jurors by the defense, one juror stated that she thought she could vote for life imprisonment for a murderer if convinced the death penalty was not warranted by the evidence, but then asked the court whether it had any responsibility for parole from life sentences. The trial judge instructed her and the other jurors that "life means life" and they should not concern themselves with any other definition of that term. Following these questions, defense counsel was permitted to ask whether the juror thought she could consider the evidence presented on sentencing and follow "the law and only the law as the Judge gives it to [her], irrespective of [her] own feelings?" The juror replied, "I think so." Defendant argues that the trial judge abused his discretion by failing to permit defense counsel to pose questions to the prospective juror that were proper for ascertaining her fitness and ability to serve and for the intelligent exercise of peremptory challenges.

It is a well-recognized principle in this State that eligibility for parole is not a proper matter for consideration by the jury.

*State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979); *State v. Jones*, 296 N.C. 495, 251 S.E. 2d 425 (1976); *State v. McMorris*, 290 N.C. 286, 225 S.E. 2d 553 (1976). Therefore, the trial judge properly instructed the jury panel in this case that they were not to consider anything to the contrary that a life sentence meant life. There is no indication that the trial court's failure to allow counsel for defendant to follow up and ask the juror additional questions about parole or her views of parole in any way tended to prejudice the juror. Nor is there any indication that the juror's views about parole in any way influenced her decision in the present case. Important is the fact that defendant, despite his concern for potential prejudice, did not challenge this juror for cause or peremptorily. Moreover, and perhaps most importantly, defense counsel was able to elicit from the juror, in the context of her concern about parole from a life sentence, that she would be able to follow the law on sentencing as stated by the judge, regardless of her own feelings. Certainly this response satisfied the trial court that the juror could sit impartially and apply the law as stated. We, therefore, find no error.

[6] Next, defendant argues that the trial court erred in failing adequately to cure the prejudice from Woody Blalock's testimony that he had met defendant in prison. Prior to trial defendant twice moved *in limine* to restrict evidence that defendant had been previously convicted of kidnapping his wife. At the outset of the trial, defendant also moved *in limine* to have witnesses instructed not to refer to defendant's prior incarceration. His motion concerning the prior kidnapping offense was granted.

After testifying on direct examination about a number of convictions and sentences, including his plea bargain with the State concerning the murder of Larry Walker, Woody Blalock testified about his acquaintance with the murder victim Larry Walker. Blalock was then questioned about how long he had known defendant. When asked to describe when Blalock next saw defendant, or what relationship he had with him, Blalock stated that "we done time together." The trial court immediately sustained defendant's objection, instructed the jury to disregard the statement of the witness that they had "done time together," and asked them to raise their hands if they could follow his instructions and dismiss the witness' statement from their minds. All of the jurors raised

their hands. Defendant made no request to poll the jury nor did he move for a mistrial.

In *State v. McCraw*, we held that "[w]hen a jury is instructed to disregard improperly admitted testimony, the presumption is that it will disregard the testimony. Lacking other proof . . . a jury is presumed to be rational." *McCraw*, 300 N.C. 610, 620, 268 S.E. 2d 173, 179 (1980). Assuming, *arguendo*, that the statement was prejudicial to defendant, it was cured by the prompt corrective action of the trial court in sustaining the objection, striking the testimony, and instructing the jury not to consider it.

[8] Defendant argues that the trial court erred in overruling his objection to testimony of a State's witness relating to statements made by the victim. At trial, the prosecution was allowed to introduce testimony of Deputy Dennis Oakley concerning statements made to him by the victim Larry Walker on 10 February 1984, three days prior to Walker's murder. Walker told the deputy that: (1) he had been involved in stealing property from the Coppridge farm; (2) defendant, defendant's brother, and Woody Blalock also participated; and (3) defendant, defendant's brother, and Woody Blalock had beaten him up and all three had told him that if he ever said anything about the break-in or the whereabouts of the stolen tractor they would kill him. Walker, nevertheless, informed the deputy that a Ford tractor stolen from the break-in was sold by him and defendant to Larry Wilson.

The trial court allowed the statements into evidence over the objections of defendant and concluded as a matter of law:

1. That the evidence offered by the State of the statements made to Deputy Sheriff Dennis Oakley by Larry Walker on the night of February 10, 1984, are relevant as defined by Rule 401 to show motive, premeditation, deliberation, malice and intent of the defendant.

2. That the declarant, Larry Walker, is dead, and is, therefore, unavailable as a witness, as set forth in Rule 804(a)(4).

3. That the statement of Larry Walker is admissible as an exception to the rule against hearsay evidence, as set forth in Rule 804(b)(3), as a statement against penal interest in that it subjected him to criminal liability in a breaking or entering and larceny to such an extent that a reasonable man in his

position would not have made the statement unless he believed it to be true.

4. Corroborating circumstances clearly indicate the trustworthiness of the statement in that it led to the discovery within two days of a substantial amount of items stolen from the farm of Dr. Coppridge and at a later time the discovery of two tape measures in a specified location; that within one day of the arrest of Larry Wilson, Larry Walker was murdered, to which act Michael Wilson has been implicated by the testimony of Woody Blalock.

5. That these conclusions of law meet the test of admissibility, as set forth in *State versus Vestal*, 278 N.C. 561 (1971); *State versus Alston*, 307 N.C. 321, at page 326 (1983); and *State versus Maynard*, (1984), in that the State has shown (1) necessity; and (2) a reasonable probability of truthfulness.

6. That the statement is admissible pursuant to Rule 804(b)(5) in that the declarant is unavailable, there are circumstantial guarantees of trustworthiness . . . .

Defendant does not dispute the fact that the first portion of Walker's statement to the deputy was against Walker's penal interest—that Walker took part in the Coppridge theft. Defendant, however, argues that the remark that defendant was Walker's accomplice in the Coppridge theft does not amount to a declaration against interest and therefore lacked sufficient indicia of reliability under the right of confrontation. Defendant further argues that the remark that defendant and others beat and threatened the victim also was not against the victim's penal interest, and thus fails under 804(b)(3). Defendant apparently argues that the trial court must dissect a general statement into individual pieces so that the clearly disserving portions are separated from all others and only the clearly disserving are admitted at trial. We find such surgical manipulation unnecessary and not warranted under the facts of the instant case.

The trial judge allowed the deputy sheriff to repeat statements made to the deputy by the victim. The trial judge found all of the statements admissible under, *inter alia*, Rule 804(b)(3) of the North Carolina Rules of Evidence as an exception to the hearsay rule. Hearsay testimony is not admissible except

as provided by statute or by the North Carolina Rules of Evidence. 1 Brandis on North Carolina Evidence § 138 (Cum. Supp. 1986). Our rules of evidence provide for certain exceptions to the hearsay rule, including an exception for statements against penal interest. Rule 804 provides in pertinent part:

(b) *Hearsay exceptions.*—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \*

(3) Statement against interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability is not admissible in a criminal case unless corroborating circumstances clearly indicate the trustworthiness of the statement.

N.C.G.S. § 8C-1, Rule 804(b)(3) (1986).

The circumstantial guaranty of reliability for declarations against interest is the assumption that persons do not make statements which are damaging to themselves unless satisfied for good reasons that they are true. *See* N.C.G.S. § 8C-1, Rule 804(b)(3) (1986), comment. Succinctly, defendant argues that the only portion of the statement made to the deputy that was truly against Walker's penal interest was the remark that Walker participated in the Coppridge robbery, not the portions stating that defendant also participated in the robbery and later threatened to kill Walker if he told anyone. Defendant, therefore, challenges the admissibility of these latter two collateral statements. Since the case law concerning collateral statements under this rule of evidence in this State is negligible, we shall look to the federal courts for guidance on this point in interpreting its federal counterpart.[1]

1. Rule 804(b)(3) of the North Carolina Rules of Evidence is identical to Rule 804(b)(3) of the Federal Rules of Evidence with the exception of the last sentence. The federal rule requires corroborating circumstances only where the statement exposes the declarant to criminal liability and is offered to exculpate the accused. The

[7] The fact that statements by Walker have dual inculpatory aspects does not take the statements outside the range of Rule 804(b)(3). Although a hearsay statement inculpating a third party must be scrutinized carefully, courts generally agree that the relevant standard requires corroborating circumstances which clearly indicate the trustworthiness of the statement. *See* N.C.G.S. § 8C-1, Rule 804(b)(3) (1986); *United States v. Katsougrakis*, 715 F. 2d 769 (2d Cir. 1983); *United States v. Garris*, 616 F. 2d 626 (2d Cir.), *cert. denied*, 447 U.S. 926, 65 L.Ed. 2d 1119 (1980). Furthermore, there is no requirement under the rules that a single remark taken out of a general statement which as a whole is against the penal interest of the declarant must itself, standing alone, be against the declarant's penal interest in order to be admitted. Rather, we adopt the view of several federal courts that such collateral statements are admissible even though they are themselves neutral as to the declarant's interest if they are integral to a larger statement which is against the declarant's interest. *See United States v. Barrett*, 539 F. 2d 244 (1st Cir. 1976).

[8] Applying this rule to the facts before us, we find that the collateral statements made by the victim-declarant were part and parcel of the disserving statement and were integral to the larger statement made by the victim to the deputy. The collateral statements are essential to an understanding of the victim's motivation in making the disserving statement to the deputy. Though arguably neutral on their face, the collateral statements give meaning to the disserving statement and therefore become part of the disserving statement. Consequently, we will not require that they be dissected from the text. Other courts have tended to grant at least a certain latitude as to contextual statements, neutral as to interest, giving meaning to the declaration against interest. *Barrett*, 539 F. 2d 244 (1st Cir.). We find their reasoning persuasive and therefore find that the trial judge

North Carolina rule requires corroboration where the statement exposes the declarant to criminal liability without regard to whether it exculpates or inculpates the accused. This distinction is unimportant in formulating a rule regarding the admissibility of collateral statements since the federal courts have required corroboration when a third party is inculpated by a declaration against penal interest even though not required by their rules. The federal courts dealing with the issue have found that the confrontation clause requires such. *See United States v. Alvarez*, 584 F. 2d 694 (5th Cir. 1978). Therefore, the two rules, though facially dissimilar, are functionally identical.

was correct in admitting this collateral material since it actually tended to fortify the initial statement's disserving aspects.

[9] Rule 804(b)(3) requires a two-pronged analysis. Once a statement is deemed to be against the declarant's penal interest, the trial judge must be satisfied that corroborating circumstances clearly indicate the trustworthiness of the statement if it exposes the declarant to criminal liability. N.C.G.S. § 8C-1, Rule 804(b)(3) (1986). We agree with the finding of the trial judge that the trustworthiness of the statements was clearly indicated by the many corroborating circumstances.

As found by the trial judge, the statement of the victim led to the discovery of two tape measures in a specified location apparently thrown aside during the robbery of the Coppridge farm. Moreover, many of the farming items stolen from the Coppridge farm were found where the victim said they would be found. Indeed, this information led to the arrest of defendant's brother for possession of this stolen property. Perhaps most indicative of the truthfulness of Walker's statement and most unfortunate is the fact that he told the deputy that defendant would kill him if he told anyone about the robbery. Within a few days of making the statement and within one day of the arrest of defendant's brother based on Walker's statements, Walker was in fact found murdered. We are satisfied that these corroborating circumstances adequately clothe the statements of the declarant with trustworthiness and therefore find no error in the ruling of the trial judge. Because we find this testimony admissible under Rule 804(b)(3), we need not address its admissibility under Rule 804(b)(5).

[10] Defendant argues next that the trial court erred by limiting his right to confront and cross-examine Woody Blalock by sustaining the State's objections to questions soliciting testimony about parole eligibility under the witness' guilty plea and about the possible motive of third parties to kill the victim Larry Walker. Through these assignments of error, defendant contends that his right to cross-examine Woody Blalock was improperly curtailed in two instances. First, the court sustained the State's objection to the statement of defense counsel, "[a]re you aware that a life sentence would mean that you could get out in less time than a fifty year sentence?" Second, after cross-examining Blalock at

some length concerning a break-in he participated in on Friday, 10 February 1984, the district attorney eventually interposed an objection on the grounds of relevancy, indicating that defense counsel had gone too far astray.

After an extensive *voir dire*, the trial court sustained the State's objections to the admission of speculative evidence on the motive of third parties to commit the crime for which defendant was charged. The trial judge, however, also ruled that defendant was free to cross-examine Blalock in the presence of the jury on several statements made by Blalock on *voir dire* where defendant wished to test the credibility of the witness.

The right of cross-examination is very broad. However, the right is not without limitation. Trial courts may limit cross-examination to prohibit inquiry into irrelevant or incompetent matter or matters of only tenuous relevance, or to ban repetitious or argumentative questions. 1 Brandis on North Carolina Evidence § 35 (1982). The legitimate bounds of cross-examination are largely within the discretion of the trial judge. *State v. Chance*, 279 N.C. 643, 185 S.E. 2d 277 (1971).

This Court acknowledges and supports the established principle that cross-examination is a proper method of testing a witness as to bias concerning a promise of or his just expectation of reward, pardon, or parole as the result of his testifying for the State. *State v. Mason*, 295 N.C. 584, 248 S.E. 2d 241 (1978). Here, defendant had full opportunity to show bias, interest, and prejudice of the witness to testify against him. The record, in fact, shows that on more than one occasion the defense was able to elicit from the witness his motivation for turning State's evidence.

In *Mason*, the defense attorney attempted to question the witness about his understanding of the laws concerning parole. We held there that such a question calls for the legal knowledge of a lay witness and it was proper for the trial court, in his discretion, to sustain the State's objection. *Mason*, 295 N.C. at 592, 248 S.E. 2d at 246. Similarly, defense counsel here was attempting to elicit testimony from Blalock on the complexities of sentencing and parole eligibility which might make a life sentence shorter than a fifty year sentence. It was not an abuse of discretion to prohibit the witness from answering since the witness had al-

ready stated that he was motivated to testify for the State because of a plea bargain arrangement — testimony more probative of bias than the legal distinction asked of him by the defense.

[11] Defendant also asserts that the trial judge chilled his right of confrontation by restricting the cross-examination of Blalock concerning the activity of others in a crime in Orange County that the victim Larry Walker knew about. Apparently, defendant attempted to establish the motive of Blalock and others to murder Larry Walker because of Walker's knowledge about their criminal activities. The trial judge sustained the State's objection, disallowing further inquiry on this point by the defense. The judge found that the inquiry lacked relevance.

The general rule followed by this Court has been that:

> A defendant may introduce evidence tending to show that someone other than defendant committed the crime charged, but such evidence is inadmissible unless it points directly to the guilt of the third party. Evidence which does no more than create an inference or conjecture as to another's guilt is inadmissible.

*State v. Hamlette,* 302 N.C. 490, 501, 276 S.E. 2d 338, 346 (1981); *State v. Stanfield,* 292 N.C. 357, 233 S.E. 2d 574 (1977); *State v. Jenkins,* 292 N.C. 179, 232 S.E. 2d 648 (1977); *State v. Shinn,* 238 N.C. 535, 78 S.E. 2d 388 (1953); *State v. Smith,* 211 N.C. 93, 189 S.E. 175 (1937).

Applying this rule to the case before us, we cannot say that the trial judge erred in ruling on the question of relevancy or abused his discretion in restricting defendant's cross-examination of this witness. Blalock denied the factual allegations by defendant that Larry Walker had come to his trailer on the afternoon or evening after the alleged Orange County break-in, or that Larry Walker was involved in a discussion with others concerning guns and other articles from the break-in. Based on the testimony that Blalock gave on *voir dire,* it is clear that defendant could not establish through this witness that Larry Walker knew about the results of the Orange County break-in, had seen the stolen property from the break-in, or was known by Blalock or others to be talking to law enforcement officers about the crime. Defendant was unable to produce evidence that did more than create an in-

ference or conjecture of another's guilt. The evidence was therefore inadmissible. *See State v. Hamlette*, 302 N.C. 490, 276 S.E. 2d 338.

[12] Defendant also argues that the trial court erred in overruling his objections to evidence read to the jury from the application for the search warrant and its supporting affidavit. Defendant asserts that that evidence was hearsay. The State's evidence in this case tended to show that defendant's brother was arrested and stolen property was seized from his property based on information contained in the warrant. The affidavit identified the victim, Larry Walker, as the source of Deputy Oakley's information against defendant's brother. A copy of the warrant was served on defendant's brother. There was also testimony from Blalock that the motive for Larry Walker's murder was to stop him from "snitching."

Generally, the allegations in an affidavit for a search warrant and the contents of the warrant itself are inadmissible at trial because of their hearsay nature. *State v. Edwards*, 315 N.C. 304, 337 S.E. 2d 508 (1985); *State v. Jackson*, 287 N.C. 470, 215 S.E. 2d 123 (1975); *State v. Spillars*, 280 N.C. 341, 185 S.E. 2d 881 (1972); *State v. Oakes*, 249 N.C. 282, 106 S.E. 2d 206 (1958). However, evidence is only hearsay if it is offered into evidence to prove the truth of the matter asserted therein. *See* N.C.G.S. § 8C-1, Rule 801(c) (1986). Here, the affidavit and warrant were not introduced in order to prove the truth of the matters stated therein, but rather to prove the existence of the statements. Regardless of whether the matters therein were true, the affidavit and warrant were probative in showing that defendant had information—correct or incorrect—that the victim was informing on him and his brother. Therefore, it was not error for the trial judge to admit this evidence.

[13] Defendant next contends that the trial court erred in allowing the prosecutor to question his mother about her failure to leave the courtroom as other witnesses had done following the judge's order that the witnesses be sequestered. Apparently, the defense did not initially plan to call defendant's mother as a witness, but changed its mind after reformulating its trial strategy. Upon that change of strategy, the day before she was to take the stand, the defense sequestered defendant's mother.

When the witness was called, the State objected and moved for a *voir dire* examination of the witness' testimony since she had not been sequestered throughout the State's evidence and was present in the courtroom during the entire testimony of Woody Blalock.

On cross-examination before the jury, the State questioned defendant's mother about the fact that she had been sitting in the courtroom for parts of the trial including the time when Woody Blalock had testified. The prosecutor continued and asked whether Mrs. Wilson knew that the witnesses in the case were being sequestered. This question was objected to by defendant and sustained by the court. Defendant now argues that this line of cross-examination was unfair and suggested that defendant's mother was testifying falsely after hearing earlier testimony. We find no error.

As a general rule, the truthfulness of any aspect of a witness' testimony may be attacked on cross-examination. *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982). Under the circumstances of this case, where defendant's mother remained in the courtroom and then offered testimony directly contradicting the State's version of the case, it was appropriate for the prosecution to impeach the credibility of this witness. Assuming, *arguendo*, that it was error to ask such a question, the error was not prejudicial since the trial judge sustained the objection of the defendant and the witness was not allowed to answer the question posed.

[14] Defendant assigns as error the failure of the trial court to grant his motion to dismiss because of the insufficiency of the evidence that defendant choked Larry Walker to death with premeditation and deliberation. This argument has no merit. The trial court must determine from all the evidence, taken in the light most favorable to the State, whether there is substantial evidence that the crime as charged has been committed and that the offense was committed by the person accused. *State v. Smith*, 307 N.C. 516, 299 S.E. 2d 431 (1983).

We agree with the trial court that substantial evidence was offered tending to show that defendant choked Larry Walker to death. The testimony of the medical examiner was that a cause of Walker's death was ligature strangulation. The medical examiner

also found abrasions on the victim's neck that could have been caused by a rope. Moreover, the State's key witness testified that defendant had tied Walker up before murdering him and a portion of this rope was offered as State's exhibit 18. We find this evidence to be substantial and, therefore, will not disturb the decision of the trial court.

[15] Defendant also argues that the trial court erred in denying his motion to dismiss based on insufficient evidence to support a charge of kidnapping. Defendant was indicted for the kidnapping of Larry Walker based on his "unlawfully confining him, restraining him and removing him from one place to another without his consent." The charge was elevated to first degree kidnapping on the grounds that Larry Walker was not released in a safe place and was seriously injured. Defendant argues that there was insufficient evidence of restraint and injury separate from the evidence used to indict for first degree murder. We disagree.

First, defendant argues that the restraint integral to the kidnapping was not separate from the choking in the premeditated murder offense. This argument fails because restraint is not essential to a charge of premeditated and deliberated murder. *See State v. Prevette*, 317 N.C. 148, 345 S.E. 2d 159 (1986). Second, defendant asserts that the serious injury element of his kidnapping charge was not separate from the fatal wound in the murder. This contention is also meritless. Expert testimony at trial showed that there were some thirty-nine stab wounds on the victim's body along with several ligature abrasions. Any of these injuries might satisfy the serious injury element of first degree kidnapping. Certainly, this elevating element of first degree kidnapping is not limited to a fatal injury. We, therefore, reject this assignment of error.

[16] Defendant next argues that the prosecution violated his fifth amendment right to remain silent at trial by commenting on his failure to testify. Defendant's contention is that by arguing to the jury that the State's evidence is uncontradicted, the prosecutor was indirectly commenting on defendant's failure to testify in this case. We disagree.

This Court has held in *State v. Tilley*, 292 N.C. 132, 232 S.E. 2d 433 (1977):

> The State may fairly draw the jury's attention to the failure
> of the defendant to produce exculpatory evidence or to con-
> tradict the State's case. [W]hile the defendant's failure to
> testify is not the subject of comment or consideration, the
> jury in weighing the credibility of the evidence offered by
> the State may consider the fact that it is uncontradicted . . .
> or unrebutted by evidence available to the defendant.

*Tilley*, 292 N.C. at 143, 132 S.E. 2d at 410 (citations omitted).

Here, the district attorney merely argued that no one had
contradicted the testimony of Blalock. The statement made by the
prosecutor that led to the objection by defendant was, "How
many defendant's [sic] witnesses have you heard on this witness
stand to tell you and impeach any of the evidence that the State
of North Carolina has presented?" We agree with the trial court
that this statement was sufficiently innocuous so as not to serve
as a comment on defendant's failure to testify.

[17] Next, defendant argues under this same assignment of error
that the trial court erred in allowing improper arguments by the
State to explain the State's failure to examine defendant's car for
fingerprint evidence. Defendant had emphasized the fact that the
victim's fingerprints were not found on defendant's car. The pros-
ecutor merely argued that the car had been in defendant's posses-
sion for some time after the crimes were committed and that
defendant had many opportunities to remove any fingerprints.
This testimony amounted to nothing more than an argument by
the prosecutor that the absence of the victim's fingerprints was
not very probative of anything. Since the argument was sup-
ported by competent evidence, we find no error. *See State v.
Pinch*, 306 N.C. 1, 292 S.E. 2d 203.

Defendant alleges that the trial court erred in its summary of
the evidence by stating that Larry Walker said he was beaten
two weeks before 10 February 1984, because the testimony of
Deputy Oakley was that Walker told him he was beaten "two to
three weeks" before. Defendant asserts this misstatement was
crucial, and therefore prejudicial, because Blalock was only
discharged from the Veteran's Hospital on 21 January 1984.
Defendant did not call this error to the attention of the trial
judge.

The judge cautioned the jury in summarizing the evidence that "[i]f your recollection of the evidence differs from mine or the attorneys in their speeches to you, you are to rely solely on your recollection of the evidence in your deliberations." This instruction was repeated at the end of the trial judge's summary of the evidence. Under these circumstances we are convinced that this characterization of the witness' testimony had no impact on the jury's verdict. Thus, we reject this assignment of error.

[18] Over defendant's objection, the trial court instructed the jury on acting in concert as a permissible basis for finding defendant guilty of first degree murder. Defendant contends that this was an "abstract" theory not supported by any evidence. We find an abundance of evidence in support of the instruction.

Under the principle of acting in concert, a person may be found guilty of an offense if he is present at the scene of the crime and the evidence is sufficient to show he is acting together with another who does the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime. *State v. Miller*, 315 N.C. 773, 340 S.E. 2d 290 (1986). The record of this case shows numerous instances that support an acting in concert theory.

Blalock, not defendant, located the whereabouts of the victim on the evening of the murder. When Walker was in defendant's car, Blalock hit Walker in the face for denying that Walker had reported the Coppridge incident to the police. While defendant threatened Walker with his knife in the back seat of the car, Blalock got the rope out of the trunk of the car so that defendant could bind Walker. While forcing Walker into the woods, defendant held the rope that bound Walker, and Blalock held Walker by the seat of his trousers. Moreover, a forensic fiber analyst testified that fibers found on Blalock's knife were consistent with the fibers in the shirt sleeves of the shirt Walker was wearing when he was murdered. The cumulative effect of this testimony clearly shows that the acting in concert theory was properly given.

[19] Defendant also argues under this assignment of error, that by allowing him to be sentenced to death for first degree murder under the instruction given for acting in concert, the court has violated the rule set forth in *Enmund v. Florida*, 458 U.S. 782, 73 L.Ed. 2d 1140 (1982). In *Enmund*, the United States Supreme

Court, in construing the eighth amendment, held that before a participant may be sentenced to death, he must have killed or attempted to kill or intended or contemplated that life would be taken. The United States Supreme Court later extended the rule to include those participants in a murder who intended that a killing take place or that *lethal force be used. Cabana v. Bullock,* 474 U.S. 376, 88 L.Ed. 2d 704 (1986). Since all the evidence shows that defendant, himself, struck the fatal blow to the victim, no *Enmund* issue arises.

### SENTENCING PHASE

[20]   Both the State and defendant stipulated that defendant had a prior felony conviction for the second degree kidnapping of defendant's former wife on 18 June 1980, which involved the threat of violence to the person. Defendant was twenty years old at the time of this offense and, upon a plea of guilty, he was sentenced to serve from three to five years in prison. Defendant now challenges the refusal of the trial court to submit, upon his motion, the statutory mitigating circumstance that defendant has no significant history of prior criminal activity. *See* N.C.G.S. § 15A-2000(f)(1) (1983).

We hold that it was prejudicial error for the trial court to reject defendant's motion to have submitted as a mitigating circumstance that defendant has no significant history of prior criminal activity.

We recently held that N.C.G.S. § 15A-2000(b), requiring the submission of mitigating and aggravating circumstances to the jury, does not require a finding of *no* evidence of prior criminal activity before this mitigating circumstance must be submitted for the jury's consideration. *State v. Lloyd,* 321 N.C. 301, 364 S.E. 2d 316 (1988). In *Lloyd,* we said:

> When evidence is presented in a capital case which may support a statutory mitigating circumstance, the trial court is mandated by the language in N.C.G.S. § 15A-2000(b) to submit that circumstance to the jury for its consideration. Once the trial court determines that the jury could reasonably find a mitigating circumstance, the statute affords the trial court no discretion in submitting the mitigating circumstance. . . .

N.C.G.S. § 15A-2000(b) unequivocally sets forth the legislature's intent that in every case the jury be allowed to consider all statutory aggravating and or mitigating circumstances which the jury might reasonably find supported by the evidence. It is clear that the legislature did not intend that the State or the defendant be allowed to limit in any way the jury's consideration of these statutorily established aggravating and mitigating circumstances. Allowing jurors to consider and weigh all of the statutory aggravating and mitigating circumstances which they reasonably might find supported by the evidence is the only way to ensure that juries distinguish cases in which the death penalty may be imposed from those in which it may not be imposed.

*State v. Lloyd*, 321 N.C. at 311-12, 364 S.E. 2d at 323-324.

As stated in *Lloyd*, the trial court is required to determine whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity. If the trial court makes such a determination, the mitigating circumstance must then be submitted to the jury. Then, whether the evidence is sufficient to constitute a *significant* history of criminal activity, thereby precluding a finding of this factor, is for the jury to decide. *See State v. Gladden*, 315 N.C. 398, 340 S.E. 2d 673 (1986); *State v. Noland*, 312 N.C. 1, 320 S.E. 2d 642 (1984).

Though defendant did not offer evidence supporting the submission of this mitigating circumstance, such evidence was in fact present in the record. In this case, the record disclosed evidence, offered by the State, that defendant had a prior felony conviction for the second degree kidnapping of his wife, testimony that defendant had stored illegal drugs in his shed, and evidence of his complicity in the Coppridge farm theft. In *State v. Stokes*, 308 N.C. 634, 652, 304 S.E. 2d 184, 195-96 (1983), we said that "[e]ven when a defendant offers no evidence to support the existence of a mitigating circumstance, the mitigating circumstance must be submitted when the State offers or elicits evidence from which the jury could reasonably infer that the circumstance exists." We cannot say that the evidence disclosed by the record in this case amounted to such a *significant* history of prior criminal activity that no rational jury could find the existence of this mitigating circumstance. *See State v. Lloyd*, 321 N.C. 301, 364 S.E. 2d 316;

*see also State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808 (1985), *cert. denied*, 476 U.S. 1165, 90 L.Ed. 2d 733 (1986) (where this Court approved the submission of this mitigating circumstance to the jury, over defendant's objection, notwithstanding a record showing eighteen felony convictions). We therefore hold that it was error not to submit this mitigating circumstance to the jury.

We must now determine whether this error was prejudicial. N.C.G.S. § 15A-1443, entitled "Existence and showing of prejudice," provides:

> (a) A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant. Prejudice also exists in any instance in which it is deemed to exist as a matter of law or error is deemed reversible per se.

> (b) A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.

N.C.G.S. § 15A-1443 (1983).

[21] The rights guaranteed by N.C.G.S. § 15A-2000 are anchored in the eighth amendment prohibition against cruel and unusual punishment in that the statute "requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304, 49 L.Ed. 2d 944, 961 (1976). Moreover, the General Assembly, in its wisdom, has determined that certain circumstances, as a matter of law, have mitigating value and has expressly provided by statute for their submission to the jury under appropriate circumstances. The legislature having so provided, if the jury is not permitted to consider a mitigating circumstance supported by the evidence by having it submitted, a defendant's due process rights are im-

plicated. *See Lockett v. Ohio*, 438 U.S. 586, 57 L.Ed. 2d 973 (1978). Since the failure to submit the statutory mitigating circumstance in the instant case has federal constitutional underpinnings, the standard for determining prejudice is N.C.G.S. § 15A-1443(b) rather than § 15A-1443(a).

N.C.G.S. § 15A-1443(b) provides the applicable standard for determining whether a violation of a defendant's rights under the United States Constitution is prejudicial so as to require corrective action by an appellate court. Such a violation *is* prejudicial "unless the appellate court finds that it was harmless beyond a reasonable doubt," and the burden is upon the State to so prove. N.C.G.S. § 15A-1443(b); *see also State v. Edwards*, 315 N.C. 304, 337 S.E. 2d 508 (1985); *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1982); *State v. Maher*, 305 N.C. 544, 290 S.E. 2d 694 (1982).

[22]   Our decision today reaffirms this Court's position taken in *Pinch*, that the applicable standard to determine prejudice in situations where the trial court has failed to submit a statutory mitigating circumstance supported by the evidence is whether the error is harmless beyond a reasonable doubt under N.C.G.S. § 15A-1443(b). In *Pinch*, however, this Court proceeded to announce a three-prong test which could be read to be at odds with this standard.[2] Since that three-prong test shifts the burden improperly from the State to the defendant, it will no longer be used by this Court in determining the existence of prejudice under the constitutional standard.

[23]   Applying N.C.G.S. § 15A-1443(b) to the case *sub judice*, we must determine whether the State has carried its burden of proving that the error was harmless beyond a reasonable doubt. We of

---

2. We said in *Pinch*:

a defendant demonstrates reversible error in the trial court's omission or restriction of a statutory or timely requested mitigating circumstance in a capital case *only if he affirmatively establishes* three things: (1) that the particular factor was one which the jury could have reasonably deemed to have mitigating value (this is presumed to be so when the factor is listed in G.S. 15A-2000(f); (2) that there was sufficient evidence of the existence of the factor; and (3) that, considering the case as a whole, the exclusion of the factor from the jury's consideration resulted in ascertainable prejudice to the defendant.

*State v. Pinch*, 306 N.C. 1, 27, 292 S.E. 2d 203, 223-24 (emphasis added).

course have no way of knowing whether the failure to submit this statutory mitigating circumstance to the jury may have tipped the scales in favor of the jury determination that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty. This is especially true here since the jury found no mitigating circumstances. "We have also recognized that common sense, fundamental fairness, and judicial economy require that any reasonable doubt regarding the submission of a statutory or requested mitigating factor be resolved in favor of the defendant." *State v. Brown*, 315 N.C. 40, 62, 337 S.E. 2d 808, 825, *citing State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203.

The record shows that the jury was aware of the prior criminal activity of defendant, yet the jury was not allowed to consider the quality of this activity in its deliberations because this statutory mitigating circumstance was not submitted. We cannot state that had this mitigating circumstance been submitted to the jury, the jury would not have found its existence. *See State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808. We have emphasized that the deliberative process of the jury envisioned in N.C.G.S. § 15A-2000 is not a mere counting process and that nuances of character and circumstance cannot be weighed in a precise mathematical formula. *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979). Consequently, we cannot state affirmatively that had this one mitigating circumstance been found and balanced against the four aggravating circumstances, the jury would still have returned a sentence of death. We therefore are unable to say that the failure to submit this mitigating circumstance was harmless beyond a reasonable doubt.

For all the reasons discussed above, we find no prejudicial error in the trial or sentencing of defendant for kidnapping nor do we find prejudicial error in the guilt-innocence phase of defendant's trial for murder; however, we vacate defendant's sentence of death and remand to the trial court for a new sentencing hearing.

84CRS4559 — Kidnapping — no error.

84CRS839 — Murder — no error in guilt phase; death sentence vacated and remanded for new sentencing hearing.

Justice MARTIN concurring.

Although I concur in the well-reasoned majority opinion, it is appropriate to discuss the meaning of "significant" as used in N.C.G.S. § 15A-2000(f)(1). The majority opinion emphasizes "significant" without any explanation. "Significant" means "having or likely to have influence or effect." *Rutledge v. Tultex Corp.*, 308 N.C. 85, 101, 301 S.E. 2d 359, 370 (1983). Here, "significant" means that the activity is likely to have influence or effect upon the determination by the jury of its recommended sentence.

Why did the legislature restrict the prior criminal activity to "significant" activity? Simply answered, the legislature could envision cases in which a defendant had a history of criminal activity but it was of such a nature that it would not be likely to influence or affect the jury's decision of whether to recommend a life or death sentence. In other words, the prior criminal activity could be found by the jury to be completely irrelevant to the issue of sentencing. The prior activity of the defendant could be found by the jury to be completely unworthy of consideration in arriving at its decision. There could be evidence of prior criminal activity in one case that would have no influence or effect on the jury's verdict, which, in another case, could be the pivotal evidence.

Although the requested mitigating circumstance depended upon evidence that the jury ultimately found supported an aggravating circumstance, had the mitigating circumstance been presented to the jury it could have found that the criminal activity described by such evidence was not significant to its decision. Arguably, the submission of the mitigating circumstance could have affected the jury's finding with respect to the aggravating circumstance. Any aspect of defendant's character, record, or other circumstance, supported by evidence by either defendant or the state, or both, should be considered by the jury. *State v. Irwin*, 304 N.C. 93, 282 S.E. 2d 439 (1981).

Justice MEYER dissenting.

I dissent from the majority's holding that defendant is entitled to a new sentencing hearing in the murder case for error in failing to submit the mitigating circumstance of "no significant

history of prior criminal activity." I am of the opinion, first, that the trial judge did not err in refusing to submit that mitigating circumstance and, second, that even if the judge erred in refusing to submit it, such error was harmless.

I

First, I believe that the trial judge acted properly in refusing to submit the mitigating circumstance in question. At a capital sentencing hearing, it is the duty of the defendant to present evidence of any circumstances in mitigation of sentence. Our analysis in *State v. Hutchins* is particularly instructive for the case at bar. There, we stated as follows:

> The State does not have the burden of proof that in a given capital case no mitigating circumstances exist. It is the responsibility of the defendant to go forward with evidence that tends to show the existence of a given mitigating circumstance and to prove its existence to the satisfaction of the jury.

*Hutchins*, 303 N.C. 321, 355-56, 279 S.E. 2d 788, 809 (1981) (citation omitted), *cert. denied*, 464 U.S. 1065, 79 L.Ed. 2d 207 (1984).

The trial court must include on the written list of statutory mitigating circumstances submitted to the jury any enumerated circumstance *if* it is supported by the evidence. The trial court is not required to instruct upon a statutory mitigating circumstance unless defendant, who has the burden of persuasion, brings forward sufficient evidence of the existence of the specified circumstance. *State v. Hutchins*, 303 N.C. 321, 355-56, 279 S.E. 2d 788, 809. *See also State v. Taylor*, 304 N.C. 249, 277, 283 S.E. 2d 761, 779 (1981), *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1398 (1983). As we said in *Taylor*, "If the defendant does not offer any evidence to show the existence of a mitigating circumstance, it is clear *a fortiori* that he does not carry this burden, and thus is not entitled to an instruction on a mitigating circumstance." *Taylor*, 304 N.C. at 277, 283 S.E. 2d at 779.

In the case at bar, defendant Wilson simply presented no evidence that he had no significant history of prior criminal activity. Instead, he relied entirely on the evidence the State had offered to prove the statutory aggravating factor that defendant had been convicted of a felony involving the threat of violence.

Not only did the defendant in this case not present any personal testimony that he had no other convictions, not one of the witnesses for the defendant or for the State testified that defendant had no other convictions or that defendant had not been involved in any other criminal activities. There was never any attempt by the defendant or the State to disclose the defendant's entire criminal record or lack thereof. There was no evidence offered as to the number or type of defendant's convictions, except for the single conviction of second-degree kidnapping.

The evidence concerning this single conviction of second-degree kidnapping came into the case when the State established one of the aggravating factors which was submitted to and found by the jury, to wit, that defendant had previously been convicted of a felony involving the threat of violence to the person. In order to prove this aggravating factor, the State simply put on one conviction — that of the second-degree kidnapping. The defendant, apparently in order to forestall the State from presenting additional evidence concerning the nature of this kidnapping, stipulated that the prior kidnapping was a felony involving the threat of violence to the person. The stipulation was to the effect that the defendant had been so convicted, that there was a threat of violence employed, and that defendant had received a sentence of three to five years. There was no stipulation that defendant had only one prior felony conviction and no evidence offered by either the defendant or the State to that effect.

In addition, there was evidence in the record of the defendant's theft of property from a farm and of defendant's concealing drugs in a shed. Indeed, when the defendant requested the instruction concerning his lack of any significant history of prior criminal activity, the State argued to the trial judge that there had been no attempt by either party to establish any record of the existence or nonexistence of the defendant's criminal record. The State thus had no opportunity to develop defendant's record concerning other felonies, misdemeanors, or criminal activity. There is simply no evidence in the record before us from either defendant or the State that defendant's conviction of second-degree kidnapping is the *only* felony conviction on his record, or that he has been convicted of no other crimes of any degree of seriousness, or that defendant was guilty of no other criminal activity. The only evidence of other "criminal activity" was that de-

State v. Wilson

fendant was deeply involved with his brother and others in the theft of major farm equipment from the Coppridge Farm and that defendant stored drugs in a shed.

That defendant made no attempt to introduce evidence that he had not been convicted of any other crime or committed any other criminal activity is not at all surprising. By not attempting to establish this mitigating circumstance, the defendant effectively prohibited the State from establishing defendant's history of convictions and criminal activities. Had the defendant offered evidence of the requested mitigating circumstance, the State could, of course, have offered evidence in rebuttal. In the case at bar, it was particularly important to the defendant to foreclose the prosecution from presenting any available evidence which might have established his involvement in what was obviously an ongoing theft ring.

I find it exceedingly strange that the very evidence which was adequate to support the aggravating factor that defendant had been convicted of a felony involving a threat of violence, which was submitted and found by the jury, is now characterized by the majority as possibly not a "significant" history. The seriousness of the felony of which defendant had previously been convicted, which was stipulated by him to have involved the threat of violence to the person, was such that it was submitted, as required by statute, as an aggravating factor which could be used to support the imposition of the death penalty. No rational jury could reasonably infer from the commission of this serious felony of violence, so recent in time to this murder, that defendant did not have a significant history of prior criminal activity. I am satisfied to a certainty that the court did not err in failing to submit the requested mitigating circumstance of "no significant history of prior criminal activity."

II

Second, even if I agreed with the majority that the trial judge erred in failing to submit to the jury the mitigating circumstance in question, I believe that the error was harmless. I do not now address the question of whether the majority has employed the proper test for prejudice. Here, the error was harmless whether it is analyzed under N.C.G.S. § 15A-1443(a) or (b).

The majority's conclusion that this "error" cannot be said to be harmless is especially surprising in view of the facts in this case. The defendant kidnapped the victim, accused him of "snitching" on the defendant, took him to a remote area, choked him, threatened him with a knife for a long period of time, struck him in the face, tied a rope around his neck, hit him in the head with a tree limb, stabbed him as he pled with him, beat him, garroted him, stabbed him numerous times, covered his body, and bragged that "the son of a bitch won't talk any more. I cut his throat." The victim here was strangled and stabbed to death. His body had thirty-nine stab wounds, thirty-one of which were in the back. There were additionally three defensive-type incised wounds on his arm and hand. In addition to abrasions from the rope on his neck, there were stab wounds on the left and right sides of his neck, as well as in the back of his neck. There were lacerations on his chin, right forehead, right ear, and hand. Both sides of his lower jaw were fractured, as was a finger on his right hand. There were blunt force injuries and contusions, abrasions, and bruises to his head, face, neck, arms, and legs, and there was hemorrhaging in the brain.

The jury found no mitigating circumstances although six of them, including the statutory mitigating circumstance of defendant's age at the time of the crime, were submitted for the jury's consideration. Among those submitted to the jury and which the jury refused to find were that "[p]rior to June 18, 1980, Michael Ray Wilson had no prior history of assaultive behavior" and "[a]ny other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value." On the other hand, four aggravating factors were submitted to the jury, and the jury found all four of them to exist. These included that the defendant had been previously convicted of a felony involving the threat of violence to the person and that the defendant committed the murder while engaged in the commission of a kidnapping. The other two aggravating factors found by the jury were that the murder was committed to disrupt or hinder the enforcement of the laws and that the murder was especially heinous, atrocious, or cruel. The jury further unanimously found beyond a reasonable doubt that the aggravating factors were sufficiently substantial to call for the imposition of the death penalty. It is particularly significant that the jury was instructed that it could

evaluate any other circumstance or circumstances arising from the evidence which it deemed to have mitigating value. It found none.

It simply defies reason that the jury, having found the aggravating factor that defendant had committed a prior felony involving the use of violence (for which defendant was sentenced to three to five years in prison), would then turn around and find, upon the very same evidence, that he had no significant history of prior criminal activity.

The amount of psychological and physical torture present in this case, the atrocious nature of the killing, and the jury's finding of the aggravating factors and its failure to find any of the mitigating circumstances submitted convince me that even if it was error to fail to submit the requested factor of no significant history of criminal activity, and it was not, it was harmless beyond a reasonable doubt.

I vote no error in the sentencing phase as well as the guilt-innocence phase.